## WARREN INDEPENDENT SCHOOL DISTRICT, Appellant,

v.

## SOUTHERN NECHES CORPORATION, Appellee.

### No. 6788.

Court of Civil Appeals of Texas.

Beaumont.

Oct. 14, 1965.

Rehearing Denied Nov. 24, 1965.

E. G. Aycock, Ft. Worth, for appellant.

B. F. Whitworth, Jasper, Garrison, Renfrow, Zeleskey, Cornelius & Rogers, Lufkin, Wheat & Wheat, Woodville, Fountain, Cox & Gaines, Houston, for appellee.

STEPHENSON, Justice.

This is a consolidation of eight cases involving the method of evaluation of property for ad valorem taxes by the Warren

Independent School District, hereinafter called "School District". The suits brought by the taxpayers were in the nature of direct attacks seeking relief from the trial court primarily on the ground that an arbitrary and illegal scheme for the evaluation of timberland had been used for the years 1962 and 1963. The suits by the School District were for the collection of taxes for those two years. Inasmuch as each suit involved the same general questions of law, they were consolidated for convenience. Trial was before the court and judgment was rendered that the tax assessments upon the timberlands be set aside and ordered their re-assessment.

The trial court made findings of fact, a part of which were as follows:

"9. In making an appraisal of the timber lands the appraiser used a formula, or method, substantially as follows:

"(a) After an on the ground inspection, an estimate was made of the standing, marketable timber. Then, a determination was made of its value.

"(b) To determine the value of the timber lands, as distinguished from the value of the marketable, standing timber thereon, the appraiser attempted to determine the net revenue per acre to be expected from such lands over a period extending fifty years into the future. The formula was based upon the following assumptions: That the highest and best use of said lands would be the continued growing of timber, under sustained yield management; that the first timber would be cut at the end of 20 years; that further cuttings would occur at the end of 30 years, 40 years and 50 years. The appraiser then attempted to determine the cost of growing such timber during the 50 year period, and attempt was made to determine the revenue to be expected from such operation. A 5% discount was applied to both the estimated costs and the estimated revenues. The amount of estimated net income to be produced per acre was made the basis for de-termining the value to be placed upon such timber land—as distinguished from the value of the standing timber.

"10. In connection with the estimate of the value of standing timber, I find that such timber could only be cut and marketed in an orderly manner over a period of years; it could not be cut and marketed immediately. This factor was not considered by the appraiser when he made his appraisal of the value of such standing timber. No discount was allowed. And as to the growth of such standing timber, during the period before it was cut, the same was not considered by the appraiser, nor did he make any calculation as to what such growth would be.

"11. In connection with the attempt of such appraiser to determine the net income from timber lands at such distant dates in the future as twenty, thirty, forty and fifty years, I find that there are so many, essential, but unknown factors, relating to both the costs and revenues at such distant dates, that any such attempt becomes an expedition into the field of what is purely imaginary, and wildly speculative.

"12. The tax values finally placed upon the timber lands for the years 1962 and 1963 are in excess, percentage-wise, of the values placed upon other properties in the District, that is to say, the percentage of the actual cash market value of the timber lands subjected to taxation is materially greater than the percentage of the actual cash market value of other properties subjected to taxation.

"13. The 100% value placed upon the timber lands, by the District, for the years 1962 and 1963 is a value which is materially in excess of the actual cash market value of such lands.

"18. I find that at the time of such Board hearing in 1962 the members of the Board of Equalization had very great confidence in those appraisers who had

appraised the timber lands, so much so, in fact, that they were willing to delegate the function of fixing values on such lands to said appraisers. I do not find any intentional wrongdoing on the part of any of such members. But I do find an attitude on the part of such members that the appraisers could deal with the problem of fixing such values better than they, the Board members, could, and I find that they were willing to accept the judgment of the appraisers as to the values of such timber lands, whatever such judgment might be, so that it would not be necessary for the Board members to study, hear, consider or understand the evidence relating to such issues, of timber land values, nor to exercise their own judgment in passing thereon."

The trial court's conclusions of law were that the failure of the Board of Equalization to use their own judgment rendered their action invalid, and that the manner of conducting their hearings amounted to a denial of due process of law.

▇▇▇ The School District first contends the trial court erred in substituting its judgment and discretion for that of the Board of Equalization. The courts of this state are uniform in holding that the courts do not have supervisory control over the boards of equalization and that they cannot set aside a tax assessment as being null and void merely because the court differs with the equalization board as to valuation. State v. Houser, 138 Tex. 28, 156 S.W.2d 968. However, we find nothing in the findings of fact, conclusions of law or the judgment to indicate that the trial court made any such substitution. In the Houser Case, supra, the board of equalization found the value of the land to be $4,000.00 and $4,500.00 and the trial court found the value not to exceed $3,000.00. The Houser Case, supra, further holds that "if a board adopts a method that is illegal, arbitrary, or fundamentally wrong, or if its valuation is grossly excessive, the de-

cision of such board may be attacked and set aside." The point is overruled.

▇▇▇ The School District next contends the trial court erred in rendering its judgment because the taxpayers failed to prove fraud, want of jurisdiction, illegality or the adoption of an arbitrary and fundamentally erroneous plan or scheme of valuation, or that the valuations fixed resulted in substantial injury to these taxpayers. In State v. Whittenburg, 153 Tex. 205, 265 S.W.2d 569, it is stated:

"When the attack is made because the board followed an arbitrary plan or scheme of fixing values, the taxpayer, to prevail, must show not only that the plan was an arbitrary and illegal one but also that the use of the plan worked to his substantial injury."

We have concluded that the findings of the trial court, which are set forth above, are in effect a finding by the trial court that the School District had adopted an arbitrary and fundamentally erroneous plan or scheme of evaluation which would result in substantial injury to the taxpayers. It is doubtful that these points of error are specific enough to raise issues in this court as to whether or not the findings of fact set out above in this opinion, are supported by the evidence. The School District uses the term "failed to prove" and it is not specifically stated that the findings of the trial court were supported by "no evidence" or that such findings were "contrary to the weight and preponderance of the evidence." However, we will give a broad and liberal construction to these points, and consider them as raising these issues. First, in passing upon the "no evidence" points, we consider only the evidence favorable to the findings of the trial court. The evidence of both Frank W. Bennett and Richard M. Townsend in their written report and in their testimony in person before the Board of Equalization, which was also offered in evidence before the trial court, shows that the system of placing values upon the

timber lands, as found by the trial court in finding No. 9, was adopted and used by the Board of Equalization. A comparison of the values testified to by witnesses for the taxpayers and the values arrived at by the Board of Equalization using the plan found to be arbitrary demonstrates a difference in value which this court construes to constitute "substantial injury." The findings by the trial court are supported by the evidence.

After oral argument, counsel for the School District filed an additional brief and, for the first time, urged specifically that each of the findings by the trial court was supported by "no evidence" and that such findings were each "contrary to the great weight and preponderance of the evidence". Even though this court has the authority to permit an appellant to amend its brief to present additional points of error, no such request was made by the School District in this case.

In passing upon the points as to whether the findings of the trial court were contrary to the weight and preponderance of the evidence, we considered the entire record. There is testimony in the record by members of the Board of Equalization that they were seeking to determine the true cash market value of the timber lands and considered the Bennett-Townsend Report along with all other evidence in arriving at the final values set. This and other evidence offered by the School District did nothing more than raise issues of fact for the trial court to determine, which it did adversely to the School District. We do not find that such findings by the trial court were clearly wrong or manifestly unjust. These points are overruled.

The School District further contends that the trial court erred in determining and adjudging that the Board of Equalization was required to conduct its deliberations in a formal judicial manner and that failure to do so invalidated the taxable values fixed for the properties of appellees by such Board of Equalization. This point is apparently an attack upon the conclusion of law by the trial court that the hearings before the Board of Equalization were conducted in a manner so lacking in the qualities of a judicial hearing as to amount to a denial of due process of law. The law is clear that a Board of Equalization is a quasi-judicial body and is not bound by the ordinary rules of evidence. It is allowed a broad latitude in determining values. In passing upon this point we are controlled by the presumption stated in State v. Whittenburg, supra: "Moreover, when their (Board of Equalization) official action is attacked it will be presumed that such boards discharged their duties as public agencies according to law and acted in good faith."

The record shows that counsel representing some of these taxpayers were denied the right to cross-examine some of the witnesses giving testimony before the Board of Equalization at a hearing conducted in reference to the value of producing minerals. The Board of Equalization also would not require these witnesses to return for cross-examination at the time of the hearing in reference to the value of timber lands. Even though a hearing before a Board of Equalization is not a judicial proceeding and may be informal in nature, at the same time a protesting taxpayer must be given a reasonable opportunity to develop the facts upon which the protest is based. In this instance the owners of the timber lands were protesting the valuations set upon the producing minerals. Proof that one class of property was not bearing its proportionate part of the tax burden would be evidence that an arbitrary and illegal scheme had been adopted. The owners of the timber lands should have been permitted by the Board of Equalization to cross-examine witnesses upon matters which were relevant and material to this contention. It is undisputed that they were denied this right. The evidence supported the finding by the

court that the manner in which the hearing was conducted by the Board of Equalization amounted to a denial of due process of law.

The judgment is affirmed.