**ATLANTIC RICHFIELD COMPANY et al.,
Appellants,**

v.

**WARREN INDEPENDENT SCHOOL
DISTRICT et al., Appellees.**

No. 7095.

Court of Civil Appeals of Texas,
Beaumont.

Feb. 19, 1970.

Rehearing Denied March 26, 1970.

Orgain, Bell & Tucker, Beaumont, Blades, Crain & Winters, Houston, for appellants.

Reynolds, White, Allen & Cook, Houston, for appellees.

KEITH, Justice.

The appeal is from an adverse judgment rendered in a suit wherein Atlantic Richfield Company and Sinclair Oil & Gas Company (hereinafter referred to collectively as plaintiffs) sought injunctive relief from the adoption of the ad valorem tax rolls of the defendant School District (hereinafter referred to as defendant). Plaintiffs also sought writs of mandamus to require the Boards of Equalization to assess all property within the District upon an equal and uniform basis.[1] Trial was to a jury, and the court, after setting aside certain findings in favor of plaintiffs and refusing to set aside other adverse findings, rendered judgment for the defendant upholding the assessments and the levy of taxes based thereon. Also, judgment was rendered for the District for the taxes involved in each of the respective years, 1967 and 1968. Plaintiffs appeal.

The plaintiffs contended that the Board of Equalization in each of the years involved, adopted a fundamentally erroneous plan of taxation which resulted in their substantial injury. This theory had support in the pleadings and plaintiffs procured twenty-four jury findings in support of various factual aspects of this theory. We summarize the issues, the first numeral referring to the year 1967 while the numeral in brackets refers to the identical issue submitted as to the year 1968:

No. 1 [13], the assessor used and the Board adopted a method of arriving at the valuation of improvements based upon 80% and then 75% of 80% of the 1962[2] value of the improvements as shown upon the assessor's cards.

No. 2 [14], this procedure resulted in the assessor using and the Board adopting a valuation method for such improvements "without regard to the January 1, 1967 market value thereof."

No. 3 [15], this procedure also resulted "in such improvements being placed on the tax rolls for 1967 at 45% of a sum which was substantially below January 1, 1967 market value thereof."

No. 4 [16], with respect to land upon which improvements had been placed after 1962, the Tax Assessor used and the Board of Equalization adopted a method of arriving at the 1967 valuations based upon "80% and then 75% of 80% of the value of the improvements as shown" upon the assessor's cards.

No. 5 [17], this method of valuation resulted in the valuation of such improvements "without regard to the January 1, 1967 market value thereof."

No. 6 [18], this procedure "resulted in such improvements being placed on the tax rolls for 1967 at 45% of a sum which was substantially below the January 1, 1967 market value thereof."

No. 7 [19], "without regard to the January 1, 1967 market value, the Tax Assessor used and the Board of Equalization adopted

1. The tax assessor-collector of the District and the individuals composing the Boards of Equalization in each of the years involved were also made parties defendant.

2. All of the issues refer to the *1962* valuations as shown upon the cards in the office of the assessor. This was one of the taxable years involved in the litigation reported as Warren Ind. Sch. Dist. v. Southern Neches Corp., 405 S.W.2d 100

(Beaumont TexCiv.App., 1965, error ref. n. r. e.), 404 S.W.2d 809 (Tex.Sup., 1966). As a result of this litigation, the District retained a valuation firm which valued all of the local property, as of 1962, and the Board discounted this valuation by 25% as to improvements. Thereafter, and for the years involved here, the assessor and the Board added an additional 20% discount factor to the 75% figure.

a method of determining the value of unimproved lands * * * that had not been subdivided or improved since 1962 by deducting 10% from the 1962 value of such lands as shown on the Tax Assessor's property cards."

No. 8 [20], this procedure "resulted in such [unimproved] lands being placed on the tax rolls for 1967 at 45% of a sum which was substantially below the January 1, 1967 market value thereof."

No. 9 [21], "without regard to the January 1, 1967 market value, the Tax Assessor used and the Board of Equalization adopted a plan or formula for determining the value of lots sold in subdivisions which had been created after 1962."

No. 10 [22], this procedure resulted in "such lots being placed on the tax rolls for 1967 at 45% of a sum which was substantially below the January 1, 1967 market value thereof."

No. 11 [23], "without regard to the January 1, 1967, market value thereof, the Tax Assessor used and the Board of Equalization adopted a method of determining the value of unsold lots in subdivisions created after 1962, which consisted of using as the value of such unsold lots 90% of the 1962 value per acre shown on the Tax Assessor's property cards."

No. 12 [24], this resulted "in such unsold lots being placed on the Tax Rolls for 1967 at 45% of a sum which was substantially below the January 1, 1967 market value."

Defendants' motion to disregard these answers of the jury did not challenge the sufficiency of the evidence to support the findings of the jury; but, instead proceeded upon the theory that the series did not "submit ultimate issues of facts upon which a Judgment could be predicated." The elaboration of this motion gives these reasons in support thereof: the issues are merely evidentiary; such issues do not establish the market value of the respective classes of property inquired about; they do not establish any basis for deter-

mining "in dollars and cents, substantial injury to the Plaintiffs"; they do not establish any basis "for determining, in dollars and cents, the extent of any injury in excess taxes to the Plaintiffs"; they do not establish that the valuations placed upon the properties inquired about in the issues were the result "of fraud or something other than a mere mistake or honest error in judgment" on the part of the Board (with attention being called to the fact that in other issues the Board was found to have acted in good faith); the issues do not establish "the use of a deliberate and intentional scheme" by the Board to permit the properties inquired about to escape their fair burden of taxation; and, the issues do not establish that the Boards deliberately and intentionally used a different assessment ratio on plaintiffs' property from that used on the properties mentioned in the issues. District, in its brief, says:

"Appellees do not contest the findings of the jury in response to Issues 1 through 24 as being without support in the evidence, but rather contend that the Trial Court correctly disregarded said issues because said issues would not support a judgment for Appellants."

Before turning to a consideration of the law applicable to the contentions made, we summarize the remainder of the special issues submitted to the jury: No. 25 [26], the jury did *not* find that the Board "adopted a method of valuation [of plaintiffs' properties] without regard to the January 1, 1967 market value." No. 27, the market value of plaintiffs' oil and gas properties in 1967 was $21,928,760.00 and [No. 28] in 1968 the market value was $22,702,795.00. Finally, the jury found in answer to No. 29 [30] that the 1967 Board "made a good faith effort to fairly and honestly assess all taxable property within the District at a fair, just, equal and uniform valuation for taxing purposes."

The District summarizes the evidence relating to the assessment rolls, the tax

levies, and the resulting amount of taxes raised in this manner:

"For the year 1967, after applying the assessment ratio of 45%, the total assessed valuation on the tax roll was $27,-892,990.00 of which approximately $20,-500,000.00 or 74% was oil and gas property, and $7,138,260.00 or 25.6% was local property. The application of the tax rate of $1.40 per $100 of assessed value produced total taxes in the amount of $390,501.86 for the year 1967.

"For the year 1968, the total assessed valuation on the tax roll was $29,685,-018.00 of which $22,086,060.00 or approximately 74.5% was oil and industrial property, and $7,486,048.00 or 25.2% was local property. The application of the tax rate of $1.40 per $100 of assessed value produced total taxes in the amount of $415,590.25 for the year 1967 [sic]."

We note in passing that plaintiffs' properties were assessed and taxes levied as shown below:

1967—assessed value: $10,405,880.00 with taxes of $145,682.32.
1968—assessed value: $11,071,580.00 with taxes of $155,002.12.

Thus, plaintiffs' properties constituted approximately one-half of the *total* assessment roll, exclusive of local property and plaintiffs were assessed with approximately 36% of the *total amount of the taxes* in the entire District in each of the two years involved.[3]

District devotes a considerable portion of its brief urging its contention that plaintiffs failed "to timely avail themselves of the remedies of mandamus and injunction to prevent Appellees from putting such a plan into effect." We are not favorably impressed with this argument, either factually or legally. However, since it is urged, apparently seriously, we lengthen this opinion to dispose of the point.

3. All emphasis herein has been supplied unless otherwise indicated. All statutory

The assessments for the two years involved were attacked in separate suits which were handled separately by the trial court until the entry of the order of consolidation in December, 1968, immediately before the trial of the cause.

*No. 8142*, involving 1967 taxes, was filed on October 25, 1967. The sequence of events, with the dates applicable to this suit, are these:

A. October 2, 3 and 4, 1967—plaintiffs appeared before the Board and offered their evidence, at which time they were advised that the Board would consider the evidence and announce the decision.

B. By letter dated October 13 (but postmarked October 16) from the Board to plaintiffs' counsel, the challenge of plaintiffs was rejected except for two or three minor adjustments of no particular consequence.

C. Suit was filed on October 25, 1967, one week after receipt of notification of the rejection of the complaint to the Board. The application for a temporary restraining order ex parte was denied by the trial judge and the hearing on the application for the temporary injunction was set for November 27, 1967.

D. The regular judge of the court having recused himself, the special judge assigned to hear the case had conflicting settings in his court and continued the hearing until April 23, 1968, at which time the same thing happened again and the hearing was then set for September 17, 1968.

E. In the meanwhile, on November 20, 1967, counsel for the District filed a plea in abatement asserting that the Board had finally adjourned and there was no justiciable controversy in existence. This pleading does not ever appear to have been called to the attention of the court.

references are to Vernon's Annotated Civil Statutes.

F. Finally, and on November 25, 1967—two days before the date set for the hearing on the application for the temporary injunction—the assessor mailed out his first tax bills. There is no showing of when, if ever, *any* taxes were collected on the 1967 roll.

*No. 8236*, involving the 1968 tax proceedings was filed the very day of the appearance of plaintiffs' representatives before the Board of Equalization. While the reason is not stated in the record, the purpose is fairly obvious. In any event, the application for the temporary restraining order was presented to the judge promptly and denied, but the application for temporary injunction was set before a special judge for August 9, 1968.

Then, on August 7, 1968, at a time when the assessor-collector was not authorized to send out tax bills or accept payment on 1968 taxes, *present counsel* for the District filed a motion for continuance. The motion being granted, the hearing on the application for the temporary injunction was set for September 9, 1968, and was heard and denied on that date, the order being entered on December 30, 1968.

Each of the suits filed by plaintiffs was in the nature of a direct attack upon the proceedings leading up to the imposition of the tax burden upon their properties. State v. Federal Land Bank of Houston, 160 Tex. 282, 329 S.W.2d 847, 850 (1959). The attack was not collateral, as in the defense of a suit for delinquent taxes. City of Waco v. Conlee Seed Co., Tex., 449 S.W.2d 29, (1969). The plaintiffs used diligence in each of the two years involved in seeking judicial relief from the imposition of the taxes upon their properties.

We note that in 1967, the hearing before the Board of Equalization did not commence, insofar as plaintiffs were concerned, until October 3, 1967. This was four months later than the statute provided for submission of the lists by the assessor to the Board of Equalization. Article 7218. It was three days *after* the assessor was required by law to begin accepting taxes for that year. Article 7255. The suit was filed more than a month before the first tax bill went out of his office.

There is even less justification for the contention being made with reference to the 1968 proceedings, *even though the Board was only two months late in meeting this year*. The suit had been filed, the application for temporary restraining order denied, and the suit continued at *present* counsel's request, nearly two months before the taxes could be accepted legally by the assessor. Orange County v. Texas & New Orleans Railroad Company, 35 Tex.Civ. App. 361, 80 S.W. 670, 671 (1904, error ref.). The temporary injunction was denied before the taxes became due and payable.

The suit filed by plaintiffs, in each instance, was a direct attack upon the tax assessment plans by the District upon plaintiffs' properties; being filed before the plan was placed in effect, the principles governing the cause are those set forth in City of Houston v. Baker, 178 S.W. 820, 823–824 (Galveston Tex.Civ.App., 1915, error ref.); and City of Wichita Falls v. Cooper, 170 S.W.2d 777 (Fort Worth Tex.Civ.App., 1943, error ref.), both of which are cited with approval in City of Arlington v. Cannon, 153 Tex. 566, 271 S.W.2d 414, 416 (1954). See also, Superior Oil Co. v. Sinton Independent School Dist., 431 S.W.2d 383, 386 (Corpus Christi Tex.Civ.App., 1968, no writ).

At the time the suits were filed, the plan of taxation of the District had not been put into effect and plaintiffs were not subject to the more onerous burdens mentioned by Justice Calvert in *Cannon*, supra (271 S.W. 2d at p. 417):

> "Once such a plan is put into effect the litigant may defeat the recovery of taxes only to the extent that they are excessive and he must assume the burden of proving excessiveness."

The time within which an aggrieved taxpayer can bring the direct attack against an

illegal assessment of taxes is, by the very nature of the taxing procedure, severely limited, there being only a four-month interval between the time the rolls may be presented to the Boards of Equalization and the time when the taxes become due and payable. (Article 7218 provides that the assessor "shall submit all lists of property" to the Board of Equalization "prior to the first Monday in June." Taxes become due and payable on October 1. Article 7255.)

When a taxpayer challenges the imposition of taxes upon his property, in a direct attack based upon a constitutional infirmity and prosecutes his suit with diligence, that is all that we should require. If the taxing unit, after the challenge, proceeds to collect its taxes, it does so without prejudice to the rights of the diligent litigant. In our opinion, plaintiffs were not required to do more than is shown in this record to have been done by them in order to preserve their status. District's attempt to thrust upon them the burden attendant upon a collateral attack is denied.

Although the District does not attack the sufficiency of the evidence to support the jury's answers to the first 24 special issues which were set aside by the trial court, we, nevertheless, have reviewed such evidence and find it sufficient to support such findings. Thus, plaintiffs established *as a matter of fact* that all of the several types of property making up the "local" roll—a full one-fourth of the total tax roll—were placed on the roll "at a sum which was substantially below" the market value thereof, and without regard to its market value.

In State v. Whittenburg, 153 Tex. 205, 265 S.W.2d 569, 572 (1954), Justice Calvert said:

"Article VIII, § 1 of the Vernon's Ann. St. Constitution provides that 'Taxation shall be equal and uniform' and that all property 'shall be taxed in proportion to its value, which shall be ascertained as may be provided by law.' By Article 7174, Revised Civil Statutes, 1925, the legislature has directed that 'real property shall be valued at its true and full value in money,' and by Article 7212 has directed boards of equalization to hear evidence touching the 'market value or true value' thereof. Our courts have interpreted these provisions to mean that assessed valuations shall be based on 'the reasonable cash market value' of property. Rowland v. City of Tyler, Tex. Com.App., 5 S.W.2d 756, 760."

Having made proof of these *facts,* plaintiffs established, as a matter of law, the adoption of a fundamentally erroneous plan of taxation of the local properties. The plan by which one-fourth of the entire roll was systematically and substantially undervalued by blind adherence to the 1962 valuations modified by the discount formulae showed clearly that the assessment of such properties was arbitrary and illegal. Whelan v. State, 155 Tex. 14, 282 S.W.2d 378, 380 (1955) and cases therein cited.

But, plaintiffs having so established the erroneous and arbitrary plan of taxation of local property had not then completely discharged the burden the law placed upon them as a condition precedent to relief. They labored under the burden of showing that the plan so adopted resulted in injury to them.[4] We turn, consequently, to a consideration of the question of whether they have discharged this burden.

At the outset, we note that the plaintiffs tendered evidence of eminently qualified experts as to the value of its property, a matter to which we will return later, thereby satisfying the requirement first set out by this court in Montgomery County v.

---

4. In City of Orange v. Levingston Shipbuilding Co., 258 F.2d 240, 248 (5th Cir., 1958), Judge Brown stated the rule in his usual apt manner, saying: " * * * no matter how illegal the assessment, no matter how much it violates the State Constitutional pattern, the only relief of a taxpayer, *defending delinquent tax suit* is to show in dollars that he is worse off." This language is quoted with approval by the Supreme Court in the *Federal Land Bank Case,* supra (329 S.W.2d at p. 850).

Humble Oil & Refining Co., 245 S.W.2d 326, 335 (Beaumont Tex.Civ.App., 1951, error ref., n. r. e.). The *Humble Case* was expressly approved in *Whittenburg* (265 S.W.2d at 574) and *Cannon* (271 S.W.2d at 417). *Humble* and *Cannon* were both in the nature of a direct attack upon the assessments, while *Whittenburg* was collateral, it being a suit for delinquent taxes. *Humble* was denied the relief because it did not tender evidence to show the value of its own properties, consequently failed to discharge its burden of showing injury.

In our case, the jury found the fair cash market value of plaintiffs' properties at the exact figure testified to by District's witness, Awalt. For the year 1967, the finding of value was $21,928,760.00 which was reduced to 45% of its actual value in accordance with the formula used, resulting in an assessment of $10,405,880.00. For 1968 the market value was found to be $22,702,795.00 with an assessment of $11,071,580.00. It appears, therefore, if the findings of the jury as to the fair cash market value of plaintiffs' properties are to be followed (and they were followed implicitly by the trial court), plaintiffs' properties were assessed at 45% of the fair cash market value. On the other hand, 25% of the entire roll (the "local" roll) was taxed at a value substantially below 45% of actual value and without reference to market value. There was no finding as to the actual fair cash market value of any specific piece of property on the local roll for either of the two years involved, nor was there a finding of the fair cash market value of the property found on the local roll, treated as a unit.

■ Article 8, § 1 of the Constitution, Vernon's Ann.St., requires that "taxation shall be equal and uniform," and the term "value," as used in the Constitution, means the reasonable cash market value. Lively v. Missouri, K. & T. Ry. Co., 102 Tex. 545, 120 S.W. 852, 856 (1909); Rowland v. City of Tyler, 5 S.W.2d 756, 760 (Tex.Comm. App., 1928); Dietrich v. Phipps, 438 S.W. 2d 900, 902 (Houston Tex.Civ.App., 1st, 1969, no writ).

In effect, the jury found that none of the several types of property making up the "local" roll was assessed at 45% of its fair cash market value, and affirmatively found, in each instance, that such property was placed on the rolls "at a sum which was substantially below" the market value in each of the years. This was a finding that one-fourth of the total property on the combined rolls was systematically undervalued by a substantial amount through adherence to the plan adopted by the assessor and the Boards of Equalization. In following this plan of assessment of the local properties, the assessor and the Boards adopted a plan of valuation without reference to market value, just as the jury found. In so doing, the Boards adopted a fundamentally erroneous plan of taxation whereby the values of such property were determined in an arbitrary manner. Such is the natural and inevitable result of the findings of the jury. Corrigan Properties Inc. v. City of West University Place, 430 S.W.2d 917, 919 (Houston Tex.Civ.App., 1st, 1968, no writ), and cases therein cited.

■ No taxing agency is authorized to assess property without regard to its fair market value. The adoption of a plan of assessment without regard to market value, which results in one class of property bearing a disproportionate share of the tax burden is fundamentally erroneous. *Lively Case,* supra. See also *Southern Neches Corp. Case,* supra (405 S.W.2d at p. 103).

Plaintiffs offered the testimony of two qualified appraisers as to random appraisals they had made of parcels of property in the District. Terry appraised 37 tracts and gave his opinion as to the ratio of assessment to actual value as 19.6% in 1967 and 19.8% in 1968. Hall used 15 properties and his ratio was slightly lower: 18.1% in 1967 and 16.3% in 1968. Plaintiffs offered in evidence more than 3,700 cards from the assessor's records, many of which showed sales of the property at arms length at

prices far in excess of the values showing thereon. Even the assessor and two of the Board members had property upon the local roll at a value much less than the theoretical 45% of actual value.

■ This evidence was properly received in connection with the first 24 issues which we have summarized and the District made no effort to rebut either the evidence or the inferences which naturally flowed therefrom.

■ Plaintiffs thus made out a prima facie case of showing that their properties were assessed upon an unequal basis compared with the property on the local roll. They did not have the burden of showing the value of each piece of property in the District in order to prevail. Such a requirement would impose an impossible burden upon a taxpayer, and one not required by the law. Dallas County v. Dallas National Bank, 142 Tex. 439, 179 S.W.2d 288, 290 (1944); State v. Whittenburg, supra (265 S.W.2d at p. 573); Corrigan Properties, Inc. v. City of West University Place, supra (430 S.W.2d at p. 922).

The findings of the jury (Issues 1–24), taken with the admitted assessment of plaintiffs' properties at what the *District* contends to be 45% of actual value, supplied the necessary predicate for the invocation of the rule laid down by Chief Justice Alexander in the *Dallas County Case*, supra.

■ In a collateral attack upon an assessment, the taxpayer has the burden of proving the precise dollar amount of the increased tax burden placed upon him because of the illegal assessment. City of Orange v. Levingston Shipbuilding Co., supra, footnote 4, and cases therein cited. This is "the penalty the taxpayer must pay for sitting idly by while the taxing authorities put into effect a plan of taxation" which discriminated against him. City of Arlington v. Cannon, supra (271 S.W.2d at p. 417).

In a direct attack, however, the burden is not nearly so onerous. The taxpayer must show only *substantial* injury by reason of the adoption of the illegal plan of assessment. *Whittenburg*, supra (265 S.W.2d at p. 573).

In support of their contention that they have discharged their burden of showing substantial injury, plaintiffs have included in their reply brief a tabulation which we find to be true to and supported by the record. We reproduce this tabulation and its accompanying comment, adopting it as our own summary of the evidence on the point.

| | 1967 Assessment | 1967 Tax | Percent of total |
|---|---|---|---|
| Local Properties Roll (Pages 69 thru 203) | $ 7,138,260 | $ 99,935.64 | 25.6% |
| Appellants' Properties | $10,405,880 | $145,682.32 | 37.3% |
| | 1968 Assessment | 1968 Tax | Percent of total |
| Local Properties Roll (Pages 71 thru 213) | $ 7,486,848 | $104,815.87 | 25.2% |
| Appellants' Properties | $11,071,580 | $155,002.12 | 37.3% |

"The remaining portion of the rolls for both 1967 and 1968 is the oil and industrial roll. It consists almost entirely of producing oil and gas properties ap-

praised by Pritchard & Abbot. It is undisputed that these properties are on the rolls at the 45% level of assessment. You therefore have 25.6% of the roll (local properties) being assessed at a level of assessment of only 27% in 1967 and 1968 or as found by the jury substantially less than 45% and yet at the same time, Appellants' properties comprising 37% of the roll is being assessed at a level of assessment of 45%. By equalizing Appellants' properties with the local properties, it is obvious that a substantial reduction would result in the amount of Appellants' taxes."

 Based upon this calculation, plaintiffs assert that their tax bill was excessive by the sum of $58,272.90 for the year 1967 and the sum of $62,000.91 for the year 1968. Without accepting the assertion as to the precise dollar amounts of the excessiveness as being true, we are, nevertheless, of the opinion that the plaintiffs have discharged their burden of showing substantial injury. Whelan v. State, supra (282 S.W.2d at p. 384) ; Dietrich v. Phipps, supra (438 S.W.2d at p. 903).

It necessarily follows from what we have said, that the judgment of the trial court must be reversed unless the defendant District can prevail upon its findings to Special Issues Nos. 29 and 30 submitting the issue of good faith on the part of the Boards of Equalization in each of the two years involved.

Defendants contend that such findings constitute a complete defense to the plaintiffs' suit, relying upon *Whittenburg,* supra; Bernhardt v. Port Arthur Independent School District, 159 Tex. 488, 324 S.W.2d 163 (1959) ; and, Superior Oil Co. v. Sinton Independent School District, supra. The first two cases cited are good authority for the abstract proposition that in a collateral attack upon the action of the Board of Equalization, the taxpayer has the burden of showing "illegality, or the adoption of an arbitrary and fundamentally erroneous plan or scheme of valuation." (*Whitten-*

*burg,* 265 S.W.2d at p. 573). Moreover, when their official action is attacked it will be presumed that they acted in good faith. Id.

In *Superior Oil,* the proof offered by taxpayer was so deficient in so many aspects that the statements therein found supporting defendants' present contentions are not pertinent, even though the case was one involving a direct attack.

Instead, the rule which we prefer to follow was first announced in *Lively,* supra (120 S.W. 856–857) wherein this language was used :

"It is evident that this [assessment of the railroad property at 100% of value] was a deliberate scheme on the part of the officers of Dallas county by which the assessment was made at the proportion of its value stated, and there is nothing in the case to indicate that there was any mistake on the part of the officers. It was the deliberately adopted policy to so discriminate between the different classes of property in the assessment for taxation. It is not necessary that the officers in so discriminating should have intended specifically to injure the appellee or other railroad companies. It is sufficient that by their action they denied the appellee the equal protection of the Constitution and laws of the state. *The intention with which the acts were done is of no consequence.* Such deliberate action on the part of officers charged with the enforcement of the law must be held to be the act of the state, and the appellee was entitled to relief against the enforcement of the excessive assessment."

See also *Cannon,* supra (271 S.W.2d at p. 417–418) citing *Lively* and State v. Houser, 138 Tex. 28, 156 S.W.2d 968, 971 (1941).

The rule was laid down in Rowland v. City of Tyler, supra, (5 S.W.2d at p. 760) :

"If, as is held, the reasonable cash market value is the true criterion, then it follows that if a board of equalization adopts a plan or scheme which is fundamentally

wrong by which values are arbitrarily determined, then the plain provision of the Constitution has been violated."

■ Under the record of this case, the so-called good faith issues were without support in the evidence and the trial court erred in failing to set aside the answers to said special issues. The findings so made, being without support in the evidence, constitute no defense to the wrongful and illegal assessment. Consequently, such findings are no impediment to the entry of a judgment for the plaintiffs setting aside the assessments forming the basis of the suit.

■ It follows from what we have said that the judgment of the trial court approving the assessment and levy of the taxes (as well as the judgment for the taxes) was erroneous. The judgment is, therefore, reversed and judgment here rendered setting aside, vacating, and holding for naught the assessments upon plaintiffs' properties in said District for each of the years involved. This judgment, however, is without prejudice to the right of the District to again assess and value plaintiffs' properties in accordance with law and to collect such taxes as may be due thereon. Article 7346; Republic Ins. Co. v. Highland Park Independent School Dist., 141 Tex. 224, 171 S.W.2d 342, 348 (1943); Nelson v. Blanco Independent School Dist., 390 S. W.2d 361, 367 (Austin Tex.Civ.App., 1965, no writ); Port Neches Independent School Dist. v. Reconstruction Finance Corp., 121 F.Supp. 561, 570 (E.D.Tex.1954).

In view of the possibility of another trial of this cause, we deem it advisable to comment upon plaintiffs' contention that the findings of the jury as to the value of plaintiffs' properties (Special Issues Nos. 27 and 28) are without support in the evidence. Plaintiffs attack these findings with a "no" evidence point and the alternative point that such findings are against the great weight and preponderance of the evidence. Our careful review of the evidence indicates that while there was some evidence to support such findings, it was legal- ·

ly insufficient. It would serve no useful purpose to discuss the evidence in detail, it being sufficient to say that were we required to pass upon the points upon this appeal, we would set aside such findings as being against the great weight and preponderance of the evidence. We make this statement at this time so as to guide the parties upon a future trial. If the evidence is the same upon the next trial, the trial court should set aside the findings and grant the plaintiffs a new trial.

Furthermore, should the evidence be the same upon another trial, particularly from the witness, Awalt, as to the factors used in evaluating the plaintiffs' properties be the same, plaintiffs would be entitled to and the court should submit special issues thereon in substantially the form shown on plaintiffs' requested issues Nos. 1 and 2. Whelan v. State, supra (282 S.W.2d at p. 384.)

What we have said disposes of the material contentions of the plaintiffs. The other complaints made are not likely to arise upon another trial.

■ The judgment which the defendants procured upon its cross action, has, of course, no basis in fact or law in view of our holdings upon the validity of the assessments made. This, of course, renders moot the question tendered by District's crosspoint [properly assigned under Texas Rules of Civil Procedure, Rule 353(c)] with respect to the denial of attorney's fees.

There remains one matter for our determination, the assessment of the costs of this proceedings. We have read carefully the opinion in City of Waco v. Owens, 442 S.W.2d 324 (Tex.Sup., 1969), which appears to be the latest expression of the Court upon the question of costs in delinquent tax suits. The question which we face is, however, not free from doubt. At the time of the institution of each of the suits involved in our appeal, the taxes were not delinquent, in fact they were not even payable. The suit by plaintiffs was to en-

join an illegal imposition of a tax burden upon plaintiffs' properties, and to require the taxing authorities to discharge the duties imposed upon them by both the Constitution and the Statutes of Texas, i. e., to levy the tax burden fairly and equally upon all of the taxpayers.

Before the trial, however, the taxes had become delinquent for the year 1967 and the cross action for judgment thereon was proper. However, when the cause proceeded to trial upon the merits, January 6, 1969, the taxes for the year 1968 were not delinquent and suit thereon was not authorized.[5] Although the point is not raised by the parties (either as to the right of the District to maintain its suit for the alleged delinquent taxes for the year 1968 or the assessment of costs in this proceeding), we face the issue because of the importance of the question to the parties.[6]

The record reveals conclusively that the defendant adopted a fundamentally erroneous plan of taxation in flagrant and callous violation of the constitutional and statutory requirements. The fact that this was challenged in 1967 should have been sufficient to put the defendant upon notice that it, as a public agency to which a part of the governmental power had been entrusted, should follow the mandates of the law. Instead, we find that the defendant not only persisted in such conduct but repeated it the following year. The defense of the plaintiffs' action reveals that the plan was consciously adopted, ruthlessly enforced, and diligently defended. These circumstances lead us, inevitably, to the conclusion that we should follow the usual practice in the assessment of costs. To do otherwise, it would seem, would be to place a premium upon wrongful action consciously taken by an agency granted the sovereign power of levying taxes. This we decline to do.

All of the authorities cited in *Owens* (incorporating as it does the *Waggoner Estate Case*[7] and the statutes therein mentioned) relate to suits for delinquent taxes, not suits to enjoin the imposition of an illegal tax burden. The statutes relied upon by the courts in both *Waggoner* and *Owens* are not, consequently, *decisive* authority for the proposition that in this type of suit, costs may not follow the usual pattern of assessment. Rule 435 in the broadest possible language authorizes this court to "make such disposition of the costs as the court shall deem proper" when the judgment of the trial court is modified.

The usual and consistent rule followed by this court, and all other Courts of Civil Appeals insofar as we are aware, is to assess the costs against the losing party. Bryan v. Thomas, 359 S.W.2d 131 (Texarkana Tex.Civ.App., 1962) affirmed 365 S.W.2d 628 (Tex.Sup., 1963). There being no statutory impediment to our following the usual practice, we assess all of the costs of this proceeding, including the costs in the trial court, against the appellee District.[8]

5. Under Article 7255, taxes become due and payable not earlier than October 1 of the taxable year and may not be paid or accepted prior to that date. Orange County v. Texas & New Orleans Railroad Co., supra (80 S.W. at p. 671). Such taxes do not become delinquent until February 1 of the succeeding year. Article 7336, subdivision (b); Forest Park Lanes, Ltd. v. Keith, 441 S.W.2d 920, 930 (Fort Worth, Tex.Civ.App., 1969, no writ) ; City of Odessa v. Lea, 381 S.W.2d 153, 155 (El Paso Tex.Civ.App., 1964, no writ). Suit upon such delinquent taxes may be instituted only after July 1 of the succeeding year. Articles 7324 and 7325.

6. Costs in the District Court, as shown by the transcript, were in excess of $250.00. A statement of facts containing more than 1600 pages has been furnished to us, but the cost thereof is not shown in the record.

7. Electra Independent School Dist. v. W. T. Waggoner Estate, 140 Tex. 483, 168 S.W.2d 645, 652 (1943).

8. Should we be incorrect in this holding, this action of ours can be corrected easily and cheaply through the procedure utilized in *Owens*, supra.

The judgment of the trial court is reversed and the cause is remanded for further proceedings not inconsistent herewith.

## ON MOTION FOR REHEARING

The District has filed its motion for rehearing asserting fifteen assignments of error supported by a written argument as to some of the assignments. We have carefully reviewed the record in the light of the renewed attack upon our findings and conclusions of law. A brief has been filed by plaintiffs answering some of District's contentions.

District's fifteenth assignment, asserting that we erred in assessing all of the costs of this proceeding against the District has caused us to make a new and exhaustive review of that facet of our decision. Admittedly, there are no direct authorities authorizing the assessment of the costs against the District in the type of suit brought by plaintiffs, and there are some very cogent reasons why such should not be done, *in the ordinary delinquent tax suit*. In plain and unmistakable language, the statutes provide that the State and County shall not be liable for court costs incurred in the collection of delinquent taxes. Article 7297 and 7333, V.A.C.S. Such exemption carries over and inures to the benefit of school districts by virtue of the provisions of Article 7343.

These statutes have been cited as authority for the proposition that costs in delinquent tax suits may not be assessed against the taxing agencies. City of Waco v. Owens, 442 S.W.2d 324 (Tex.Sup.1969); Electra Ind. Sch. Dist. v. W. T. Waggoner Estate, 140 Tex. 483, 168 S.W.2d 645, 652 (1943), both of which were cited in our original opinion. For other cases with similar holdings see: Lubbock Independent School District v. Owens, 217 S.W.2d 186, 190 (Amarillo Tex.Civ.App., 1948, error ref.); City of Houston v. McCarthy, 371 S.W.2d 587, 589 (Houston Tex.Civ.App., 1963, error ref. n. r. e.); City of Alice v. Bowers-Wright Funeral Home, Inc., 362 S.W.2d 888, 891 (San Antonio Tex.Civ. App., no writ); City of Odessa v. Lea, 381 S.W.2d 153, 156 (El Paso Tex.Civ.App., 1964, no writ); Whelan v. State, 254 S.W. 2d 558 (Texarkana Tex.Civ.App., 1953, no writ).

Ordinarily, in the absence of a statute exempting the state or a municipality from the payment of court costs, it is liable just as any other litigant. Reed v. State, 78 S.W.2d 254, 257 (Austin Tex. Civ.App., 1934, error dism.); Ibanez v. State, 123 S.W.2d 704 (El Paso Tex.Civ. App., 1938, no writ); Garrett v. City of Wichita Falls, 334 S.W.2d 624, 626 (Fort Worth Tex.Civ.App., 1960, orig. proceedings).

In this suit, the thrust of plaintiffs' suit was to compel the District to assess the property in accordance with the constitutional requirement. The suit did not originate as one to recover delinquent taxes; and, we have held that insofar as the year 1968 was concerned, the cross-action to recover delinquent taxes was premature. The effort to collect the delinquent taxes for the year 1967 was not, however, premature. Plaintiffs have prevailed, insofar as the delinquent tax phase of the litigation is concerned only because they were successful in their attack upon the assessments.

An indeterminate and uncertain portion of the court costs in this cause was incurred in connection with the District's effort to collect the 1967 delinquent taxes. Admittedly, we are without authority to assess costs against the District in its suit to recover the delinquent taxes; and, we are unable to segregate the costs attributable to the delinquent taxes and costs properly charged in connection with the effort to set aside the assessments for each of the two years involved.

In their reply, plaintiffs have not been of great assistance in solving the problem of court costs and we have determined, in view of the uncertainty of the question, both factually and legally, to recede from

our prior position with reference to court costs. Accordingly, we now sustain District's fifteenth assignment in its motion for rehearing, and set aside the portion of our judgment heretofore rendered assessing all costs of court against District. In lieu thereof, it is now Ordered that all costs in all courts be adjudged against the plaintiffs, jointly and severally.

To this extent, and to this extent only, the motion for rehearing is granted; but, as to all other assignments, said motion for rehearing is hereby overruled and refused.

Further motions for rehearing herein will be entertained in compliance with the provisions of the second main paragraph of Rule 458. Honeycutt v. Doss, 410 S.W.2d 772, 773 (Tex.Sup., 1966).