**LANCASTER INDEPENDENT SCHOOL
DISTRICT et al., Appellants,**

**v.**

**Sam W. PINSON et al., Appellees.**

**No. 18322.**

Court of Civil Appeals of Texas,
Dallas.

May 23, 1974.

Rehearing Denied June 20, 1974.

B. Robert Baker, Tim Kirk, Saner, Jack, Sallinger & Nichols, Dallas, for appellants.

Eric Eades, Jr., Eades & Eades, Dallas, for appellees.

GUITTARD, Justice.

Plaintiffs are owners of unimproved acreage subject to ad valorem taxation by defendants City of Lancaster and Lancaster Independent School District. They sued for an injunction and mandamus to restrain the City and School District from putting into effect a tax plan raising the value of unimproved acreage without a corresponding revaluation of other property. The trial court granted a temporary injunction and the City and School District appeal.

Our principal question is whether an increase in the assessed valuations of one class of property without a corresponding increase in the valuations of other classes of property is ground for injunctive relief without a showing by the complaining taxpayers that their properties are assessed at a higher percentage of true market value than other classes of property on the assessment roll. We hold that such a showing of substantial injury is required. We also hold that the question of temporary injunctive relief was not rendered moot by the action of the defendants in putting the tax plan into effect and accepting payments from other taxpayers, and that the tax assessment in question is not void because of lack of authority of the taxing officials. Accordingly, we reverse the trial court's order and dissolve the temporary injunction.

### 1. Defendants' plea in abatement

Defendants complain in their first point of error that the trial court erred in overruling their plea in abatement filed November 1, 1973, the day of the temporary injunction hearing, which alleged that the tax roll in issue had already been completed and put into effect and that more than five hundred thousand dollars in taxes had been collected. They argue that all matters involved in the application for temporary injunction were moot at the time of the hearing because the acts which plaintiffs sought to restrain had already taken place. We overrule this point because the temporary injunction sought and granted was not limited to restraint of the actions of defendants which had been completed. In their application plaintiffs prayed that defendants be notified to appear and show cause why temporary injunction should not be issued

> restraining and enjoining defendants from putting the illegal, unconstitutional and fundamentally erroneous tax plan into effect and from valuing, assessing and/or collecting any ad valorem taxes *against the plaintiffs*, or attempting to do so, based upon such illegal plan, such temporary injunction to be in force and effect during the pendency of this cause [emphasis added].

In the order granting the temporary injunction the court declined to consider the suit as a class action and limited the injunctive relief to a writ restraining defendants

> from collecting or attempting to collect or to enforce collections of ad valorem

taxes *from the plaintiffs, named in this cause,* by suit or otherwise, based upon the valuations and assessments made by defendants on the properties of plaintiffs for the year 1973, and enjoining and restraining defendants, and each of them, from placing the aforesaid illegal, discriminatory and fundamentally erroneous plan of taxation into effect *insofar as these plaintiffs are concerned* [emphasis added].

This language shows that the court did not attempt to restrain defendants from doing what they had already done, but only from collecting taxes from the named plaintiffs as a result of increased valuations based on the alleged illegal plan. In absence of a showing that the taxes assessed against plaintiffs had already been voluntarily paid, the matter was not moot. Owens-Illinois, Inc. v. Little Cypress-Mauriceville Ind. Sch. Dist., 481 S.W.2d 477, 481 (Tex. Civ.App.—Beaumont 1972, no writ) ; Briscoe Ranches, Inc. v. Eagle Pass Ind. Sch. Dist., 439₀ S.W.2d 118, 119 (Tex.Civ.App. —San Antonio 1969, writ ref'd n. r. e.).

### 2. *Substantial injury*

Defendants' thirteenth through sixteenth points complain of lack of evidence to support findings that the plan of taxation adopted by defendants will result in plaintiffs' paying more than their fair share of the taxes, and assert that in absence of any evidence of market value of plaintiffs' properties, plaintiffs have failed to establish that they were injured by the tax plan in question. These points are sustained.

 Whether injunctive relief is sought before or after an illegal assessment plan is put into effect, taxpayers must show substantial injury in order to obtain injunctive relief against such a plan; that is to say, they must show that the plan would discriminate against them by deliberately assessing their property at a greater percentage of its true value than the percentage assessed for other properties subject to the tax. City of Arlington

v. Cannon, 153 Tex. 566, 271 S.W.2d 414, 417 (1954) ; Atlantic Richfield Co. v. Warren Ind. Sch. Dist., 453 S.W.2d 190, 198 (Tex.Civ.App.—Beaumont 1970, writ ref'd n. r. e.). If the plan wholly excludes some classes of property from the assessment rolls, injury from such a plan may be shown without establishing the market value of plaintiff's property. *See* City of Wichita Falls v. Cooper, 170 S.W.2d 777 (Tex.Civ.App.—Fort Worth 1943, writ ref'd). If the plan is attacked on the ground of inequality of assessment, however, proof of actual market value of plaintiff's property is necessary, since without such proof no discrimination is established. Thus in Montgomery County v. Humble Oil & Refining Co., 245 S.W.2d 326, 335 (Tex.Civ.App.—Beaumont 1951, writ ref'd n. r. e.), the taxpayer showed that the board of equalization had used an illegal plan to raise its tax valuation in that it had raised the valuation of mineral properties to about one-third of what the board assumed to be the market value and assessed all other property at about one-tenth of its assumed market value. The court held that although this plan was illegal the taxpayer was not entitled to a temporary injunction because plaintiff was not injured if its property was actually worth more than ten times its assessed value, as evidence of actual value might show. The holding in *Humble* was expressly approved by the supreme court in State v. Whittenburg, 153 Tex. 205, 265 S.W.2d 569, 574 (1954), and also in City of Arlington v. Cannon, *supra,* 271 S.W.2d at 417.

Plaintiffs rely chiefly on Atlantic Richfield Co. v. Warren Ind. Sch. Dist., *supra,* as holding that proof of actual market value need not be shown in a timely suit for injunction and mandamus to obtain relief from a discriminatory assessment plan. The opinion does not support plaintiffs' contention because in that case both the taxpayer and the school district offered evidence of market value, and the findings of the jury established that plaintiff's property was assessed at forty-five percent of the

market value while other classes of property were assessed at substantially lower percentages. The court noted that this evidence satisfied the requirement in *Humble* concerning the requirement of proof of market value for a showing of substantial injury.

■ In the present case no evidence was presented concerning actual market values of plaintiffs' specific properties, and the trial court made no findings concerning market value. The evidence did show and the court found that all properties on the tax rolls are classified as (1) farm and country, (2) personal property, and (3) residential and business real estate; that before 1973 all property in these three classes, except in isolated instances, were assessed by defendants at values fixed in 1960; that 1973 values were substantially higher than 1960 values; that defendants adopted a plan of substantially increasing the values of farm and country properties while leaving the other classes at their 1960 valuations; that after the valuations of farm and country properties were increased the board of equalization adjusted the increased values downward by forty percent; and that the increased values, as so adjusted, would cause a substantial increase in the taxes of all owners of farm and country properties, including plaintiffs.

This evidence and these findings are not sufficient to establish that plaintiffs would be substantially injured by reason of the tax assessment plan in question. Applying the reasoning in *Humble*, we conclude that after the valuations of plaintiffs' properties were raised and then adjusted downward by forty percent, plaintiffs' properties may still not be assessed at a higher percentage of true market value than other classes of property on the assessment rolls. There is no evidence that in 1960 unimproved acreage was valued at the same percentage of its true value as other classes of property. Neither is there any evidence that values of all classes of property have increased at the same rate since 1960. So far as this record shows, the farm and

country properties may then have been substantially undervalued with respect to other classes of property, and they may still be undervalued with respect to other classes of property after the increase of 1973, even though other classes of property are still assessed at values fixed in 1960. The only witnesses who testified concerning values were T. E. Crum, the tax assessor and collector, and W. D. Fridge, a real estate expert and member of the board of equalization. Both of these witnesses testified that even after the revaluation of 1973, unimproved acreage, such as that owned by plaintiffs, was on the assessment roll at forty-five percent to fifty percent of market value while other classes of property were on the roll at seventy to seventy-five percent of market value. Defendants admit that they raised the valuations of plaintiffs' properties without a corresponding increase in valuations of other properties, but they insist that this action did not result in discrimination against plaintiffs, since it was only a partial correction of a previous discrimination in plaintiffs' favor. Although the trial court was not bound to accept the testimony of defendants' witnesses, no contrary evidence of actual market values was presented. Thus plaintiffs have not carried their burden to establish substantial injury.

### 3. *Authority of assessment officials*

Plaintiffs seek to uphold the temporary injunction on the alternative ground that the tax assessments in question are void because neither the tax assessor nor the equalization board was legally authorized to act for the City and the School District. Although the trial judge did not recite this lack of authority as a ground of the temporary injunction, he did make findings of fact relating to plaintiffs' allegations of lack of authority, and plaintiffs now present cross-points asserting that the trial court erred in failing to recite such lack of authority as a ground of the injunction. Consequently, the question is before us for decision.

### a. The city tax assessor

Plaintiffs contend that the tax assessment is invalid so far as city taxes are concerned because the office of city tax assessor did not exist at the time the assessment was made. The judge recited in his findings of fact that the office of tax assessor was not created either by the home-rule charter or by any ordinance of the City of Lancaster and that T. E. Crum was never a de facto or de jure officer because no such office was ever created. His conclusion of law was that the taxes levied by defendants were "illegal and void since they were levied by a person who was not a de jure or de facto tax assessor."

▊ We conclude that no ordinance was necessary to the existence of the office of tax assessor because that office was created in the charter by necessary implication. Article V of the charter contains elaborate provisions concerning levy, assessment and collection of taxes, and provides in section 4(a) as follows:

It shall be the duty of every person owning or holding property within the City of Lancaster to render, *to the assessor of taxes or such other person as may be provided for by ordinance, at his office* in said City, annually within the time prescribed by ordinance of said City, a full and complete inventory of all property so owned or held by him, whether real, personal or mixed, and to take and subscribe to an oath to the correctness of such inventory, which oaths may be administered *by the assessor or such other officer* as aforesaid, acting in person or by deputy which property shall be evaluated at its then fair market value. [Emphasis added.]

This provision does not authorize the City Council to create the office of tax assessor by ordinance. Rather, it authorizes the Council to provide by ordinance for the assessor's duties to be performed by some other person or officer. In the absence of an ordinance, property must be rendered to the tax assessor.

Likewise, section 5 of the charter provides that the listing and valuation of property not rendered by the owner "shall be made and done *by the assessor* or other officer designated for that purpose." Again, unless some other officer is designated, the charter imposes such duties on the assessor.

Section 6(a) provides that the City Council shall have power to pass ordinances and make provisions necessary for "fixing the duties and defining the powers of the assessor and collector of taxes or such officer as may be designated therefor by the City Council." This provision does not authorize the Council to create the office of assessor and collector of taxes but only to fix his duties and define his powers or to designate some other officer to perform such duties.

Section 6(b) provides that taxes are payable "at the office of the assessor and collector or such other officer as the City may prescribe." The use of the term "office" in this section as well as in section 4(a) is evidently used in the sense of a place to transact business, but it necessarily implies the existence of an officer whose business is transacted at such a place.

We note also that section 9(c) provides that the board of equalization shall meet "within ten (10) days after being notified *by the assessor of taxes* that the assessment rolls of the City of Lancaster are completed and ready for inspection."

▊ The creation of an office need not necessarily be declared in express words. Any language which shows legislative intent to create the office is sufficient. Ryan v. Riley, 65 Cal.App. 181, 223 P. 1027, 1031 (1924); Cason v. McLeod, 168 Ga. 702, 148 S.E. 584 (1929); Childs v. State, 4 Okl.Crim. 474, 113 P. 545 (1910). We find a clear intent to create the office of tax assessor in the charter provisions above quoted, subject only to the Council's power to designate by ordinance some other person or officer to perform the same

duties. Since there is no contention here that any other person or officer was so designated, we hold that the City Council properly appointed T. E. Crum to the office of tax assessor without any ordinance creating that office.

### b. *The city board of equalization*

■ The trial judge also found that the purported board of equalization which passed on the 1973 assessment roll for both the City and the School District was not a valid board of equalization for either, since the City Council purported to appoint only two members to the board and the School Board appointed three, and the five citizens so appointed purported to act jointly for both the City and the School District. The authority of the board to act for the City depends on article 5 § 9 of the city charter, which provides for a board of equalization "composed of three or more qualified taxpaying and property-owning citizens of the City of Lancaster, appointed by the Council." We hold that the board now in question was properly appointed under this provision, even though some of its members were initially named by the School Board, because the entire board was approved and authorized to act by the City Council.

The School Board's action is shown by a motion adopted June 11, 1973, "that the following be named to the 1973 Board of Equalization: Bill Fridge, G. Roy Heifrin, L. O. Roddy, Roy Filgo, Alternate." On July 2, 1973, the City Council adopted a motion "to instruct the Mayor to contact James McGinnis, Doyle Witherspoon, and Earl Chambers, Alternate, for appointment to the Tax Equalization Board to serve with Bill Fridge, L. O. Roddy, G. Roy Heifrin and Roy Lee Filgo, Alternate, appointed by the Lancaster School Board." The evidence shows that the members of the board which actually served in August and September of 1973 were Doyle Witherspoon, James McGinnis, James Heifrin, Roy Filgo and Bill Fridge, all of whom

were named in the City Council's action on July 2.

Since the motion adopted by the City Council expressly approved all five of the persons who actually served on the board, the fact that three of them had previously been named by the School Board is immaterial. There is no contention that any of the five were ineligible to serve. Consequently, the board was legally constituted so far as the City was concerned.

### c. *The school-district tax assessor and board of equalization*

■ Among the trial judge's "findings of fact" is the following:

The Lancaster Independent School District attempted to authorize TOMMY CRUM, the purported tax assessor-collector of the City of Lancaster to act as tax assessor-collector for the School District, but TOMMY CRUM was not the tax assessor-collector for the City since no such office existed.

We cannot accept the conclusion that Crum was not the tax assessor for the City, since we have held that the office did exist under the city charter. Neither do we agree with plaintiffs' alternative contention that Crum, if properly appointed by the city, could not act as tax assessor for the School District under Tex.Const. art. XVI § 40 (Vernon Supp. 1974), which provides, "no person shall hold or exercise, at the same time, more than one Civil Office of emolument." The trial court found that the school district did not appoint its own tax assessor. Since plaintiffs do not attack this finding, they can get no support from decisions such as Pruitt v. Glen Rose Ind. Sch. Dist., 126 Tex. 45, 84 S.W.2d 1004 (1935), and Odem v. Sinton Ind. Sch. Dist., 234 S.W. 1090 (Tex.Comm'n App. 1921, jdgmt adopted), which hold that under this constitutional prohibition a school district cannot appoint the tax assessor of a city or county as its own tax assessor.

Statutory authority exists for an independent school district to authorize city officials to assess and collect its taxes. Our question is whether the school district has complied with those statutes. We hold that substantial compliance is shown.

 The statutory authority is found in Tex.Ed.Code Ann. § 23.96(a) (Vernon 1972), which provides:

Any independent school district located entirely or partly within the boundaries of an incorporated city or town may authorize, by ordinance or resolution, the tax assessor, board of equalization, and tax collector of the municipality in which it is located, entirely or partly, to act as tax assessor, board of equalization, and tax collector, respectively, for the district.

Similar language is found in Tex.Rev.Civ. Stat.Ann. art. 1066b (Vernon 1963). The question turns on whether compliance with these statutes is shown by the "joint operating agreement" of 1961 between the School District and the City. Plaintiffs argue and the trial court found that this agreement does not purport to authorize the city tax officials to act for the School District, but rather provides for a joint assessor and joint board of equalization, which are not authorized by the statutes. This argument is hypertechnical. The agreement recites, "Whereas the School and the City have determined that it is advisable for both the City and the School to utilize the Tax Assessor and Collector, Board of Equalization of the Districts for all matters, functions and duties pertaining to the assessments, equalizing and collection of taxes . . . ." This language evidences an intention that the City and School District should have the same tax assessor and collector and the same board of equalization. If, as plaintiffs contend, the only manner in which that result could have been accomplished was for the School Board to authorize the assessor and collector and board of equalization appointed by the City Council to act as the assessor and

collector and board of equalization for the School District, then the agreement should be construed as accomplishing that result if it is subject to that construction. We conclude that it is subject to that construction. Nothing in the agreement prevents the City Council from exercising its independent judgment concerning appointment of either the tax assessor and collector or the board of equalization. With respect to the board of equalization, the agreement provides only, "the tax assessor-collector will submit the names of three qualified persons to serve on the Equalization Board to the School and City for their approval at their April meetings." Nothing in this provision or elsewhere in the agreement requires the City Council to accept and appoint to the board of equalization the persons named by the School Board. In fact, the agreement does not provide how the board of equalization should be appointed. By looking to the above statutes and the city charter we can determine that the City Council is the only body empowered to appoint a board of equalization with authority to serve both the city and the school district. So far as appears in the agreement, the City Council may exercise its independent judgment concerning appointment of the board of equalization and any action by the School Board in this connection is only by way of recommendation to the City Council. Consequently, without doing violence to the language of the "joint operating agreement," and in order to give it effect, we construe it as authorizing the city tax assessor and collector and the board of equalization of the City to act for the School District in the assessment and collection of its taxes.

 The evidence shows that the school taxes have been assessed and collected under this "joint operating agreement" ever since it was signed in 1961 and also that Crum has been assessing and collecting taxes for both the City and the School District since that time. It is also undisputed that the five-member board of equalization appointed in 1973 did act on

**388**

requests for equalization of taxes and did approve the assessment roll for that year, and also that some of the plaintiffs appeared before the board for that purpose. Both the City Council and the School Board accepted the assessment roll so prepared, equalized and approved, and used it as a basis for levying and collecting 1973 taxes. Since the statutes above discussed authorized the School District to designate these very officials to assess and equalize taxes for the School District as well as for the City, we hold that the officials in question were acting for the School District at least *de facto*, and any departure from the literal requirements of the statutes in making such designation did not render the assessment void. Blewett v. Richardson Ind. Sch. Dist., 240 S.W. 529, 532 (Tex.Comm'n App.1922, jdgmt adopted), Jackson v. Maypearl Ind. Sch. Dist., 392 S.W.2d 892 (Tex.Civ.App.—Waco 1965, no writ).

The order granting the temporary injunction is reversed and the temporary injunction is dissolved.