CHARLES SCHREINER BANK, OF KERRVILLE, a State Bank, First National Bank of Kerrville, and National Bank of Commerce of Kerrville, Both National Banking Associations: Raymond F. Barker, Henry H. Wied, and Ben R. Low, Appellants,

v.

KERRVILLE INDEPENDENT SCHOOL DISTRICT, and the City of Kerrville, Texas, a Municipal Corporation: Clyde H. Greer, Superintendent of the Kerrville Independent School District, in His Official Capacity; Juanita Maples, as Tax Assessor-Collector for the Kerrville Independent School District and the City of Kerrville, Texas, in Her Official Capacity; and Manly W. Cooper, Mayor of the City of Kerrville, Texas, in His Official Capacity, Appellees.

No. 16687.

Court of Appeals of Texas, San Antonio.

July 31, 1984.

Rehearing Denied Dec. 12, 1984.

David Jackson, Wallace & Jackson, Darrell G. Lochte, Kerrville, Joe Burkett, Jr., Kerrville, for appellants.

Thomas S. Terrell, Kerrville, Robert M. Huey, McCreary & Huey, Austin, for appellees.

Before CADENA, C.J., and ESQUIVEL and DIAL, JJ.

## OPINION

CADENA, Chief Justice.

Plaintiffs in this case appeal from a judgment denying them injunctive and other relief to prevent enforcement of a tax plan which imposes a tax on obligations of the United States Government declared exempt from taxation by 31 U.S.C. § 742. The specific complaint is that the taxing authorities, in determining the taxable value of shares of stock in three national banks, included the government obligations as part of the assets of the banks.

The suit was filed by three Kerrville banks, Charles Schreiner National Bank, First National Bank and National Bank of Commerce, joined by three individuals, each of whom owns stock in one of the banks. The three shareholders sued individually and as representatives of a class composed of all the shareholders in each of the three banks. The trial court's determination that the suit should proceed as a class action is not challenged here.

Defendants are the Kerrville Independent School District, the City of Kerrville, Clyde H. Greer, superintendent of the Kerrville Independent School District, Manley H. Cooper, mayor of Kerrville, and Juanita Maples, tax assessor-collector for both the school district and the city. The three individual defendants are sued only in their official capacities.

The assessor determined the value of the shares of stock by using the "equity capital formula," which is "the usual and customary method used in Texas to arrive at such value" for property tax purposes. *City of Midland v. Midland National Bank*, 607 S.W.2d 303, 304 (Tex.Civ. App.—El Paso 1980, writ ref'd n.r.e.). The tax was computed by determining the total amount of the capital assets of each bank and subtracting from that figure the bank's liabilities and the assessed value of the real estate owned by the bank.[1] The trial court's conclusion of law that the United States obligations are exempt from taxation and that the assessor acted illegally in including the value of such obligations as part of the capital assets of each bank is clearly correct. The formula adopted by the assessor in this case "plainly ... takes into account, at least indirectly, the federal obligations that constitute a part of the bank's assets," in violation of 31 U.S.C. § 742.[2] *American Bank & Trust Co. v. Dallas County*, 463 U.S. 855, 103 S.Ct. 3369, 77 L.Ed.2d 1072, 1079 (1983).[3]

Despite its conclusion concerning the illegal action of the assessor, the trial court denied plaintiffs relief because they had not established "substantial injury." In

---

**1.** Subtraction of the assessed value of the real estate is required because TEX.REV.CIV.STAT. ANN. art. 7166 (Vernon 1960), in effect at all times pertinent to this case, required that bank shares be taxed only for the difference between their actual cash value and the proportionate amount per share at which the bank's real estate is assessed. Since 1982, this provision for taxation of shares of stock in banks is found, expressed in simpler language, in TEX.TAX CODE ANN. § 23.11 (1982).

**2.** 31 U.S.C., as amended in 1959, provides:
All stocks, bonds, Treasury Notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority. This exemption

extends to every form of taxation that would require that either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax, except nondiscriminatory franchise or other nonproperty taxes in lieu thereof imposed on corporations and except estate taxes or inheritance taxes.

**3.** In enacting this statute, "Congress intended ... to invalidate all taxes measured directly or indirectly by the value of federal obligations, except those specified in the amendment." 463 U.S. at ——, 103 S.Ct. at 3377, 77 L.Ed.2d at 1082.

view of the trial court's finding that book value "cannot be equated with market value," it is apparent that the inability of the court to find substantial injury was due to plaintiff's failure to establish the market value of the stock.

In *City of Arlington v. Cannon*, 153 Tex. 566, 271 S.W.2d 414, 417 (1954), the Texas Supreme Court, after pointing out that the procedures adopted by the taxing authority were "wholly unlawful and fundamentally wrong," said that to obtain relief from taxes computed by "the use of an arbitrary, illegal and fundamentally erroneous plan of evaluation, the taxpayer must show substantial injury." Similar language is found in *State v. Whittenburg*, 154 Tex. 205, 265 S.W.2d 569, 573 (1954). No case has given a precise definition of "substantial injury," but both *Cannon* and *Whittenburg* indicate that unless the taxpayer shows that his property was actually assessed at a substantially higher percentage of its market value than the percentage used for other property no relief will be granted. If such showing is made, relief will be limited to the amount or extent of the excess.

Ordinarily shares of stock in banks, particularly in our smaller cities, are but rarely sold, so that what is considered to be the best method of determining market value, i.e., comparable sales, is not available. In this case the assessor candidly admitted that she was unable to find any information which would furnish a reliable basis for determining market value and, consequently, she used book value. Her testimony was that she proceeded "to establish what the fair market value would be by the use of book value." She testified that the only records of transfers of bank stock which she unearthed were found in probate records. Her testimony reveals that, in her opinion, the method she used resulted in the determination of "reasonable market value." "Book value," of course, is the same as the value determined by application of the equity capital formula.

In view of the applicable law, the traditional concept of market value is irrelevant in determining the value of bank shares for tax purposes. Even if there were brisk buying and selling of such shares on a daily basis, the market value determined on the basis of such transactions would be completely useless for the purpose of determining the value of such shares for property tax purposes. Clearly, the total value of the bank's assets would receive substantial consideration by one willing, but not forced to sell, and one willing, but not forced, to buy. Such market value would necessarily be based upon a consideration of the government obligations held by the bank, with the result that a tax computation based on such "market value" would necessarily run afoul of the federal statute.

Since, because of the scarcity of sales as well as the provisions of both state and federal law, ascertainment of the market value of bank stock is, at least from a practical standpoint, impossible, it is not surprising that the assessor in this case, like assessors throughout Texas, based her assessment on book value. There is no other feasible method for determining the value of such stock.

It is generally believed, and the assessor in this case so testified, that market value is greater than book value. Although the truth of this statement at any given time necessarily depends on economic conditions at such time, the evidence in this case makes its application extremely doubtful. According to the assessor, as to each bank the book value of the real estate substantially exceeded its market value as determined by her. In the case of the Schreiner Bank, for example, the value of the real estate as shown by the books was $1,883,-000.00, but, according to the assessor, the market value of such real estate was $1,312,033.00. Therefore, the book value of the real estate exceeded its market value by $570,967.00, or slightly more than 43%. There is no evidence that the other assets of the bank were carried on the books at figures in excess of market value. In the case of the First National Bank, the book value of the real estate was $1,944,000.00,

while, according to the tax assessor, its market value was $998,083.00, so that the book value exceeded market value by $945,917.00, or almost 95%. In the case of the National Bank of Commerce, the book value of the real estate was $446,000.00, while its market value, according to the assessor, was $229,144.00. The book value, then, exceeded market value by $216,856.00, or more than 94%. The evidence in this case furnishes no basis for concluding that the book value of the equity capital of the bank was less than its market value.

In *Cannon, supra,* the Texas Supreme Court, recognizing that it was placing an extremely onerous burden on the taxpayer, said:

> The difficulties to be encountered in making the necessary proof as a basis for relief is the penalty the taxpayer must pay for sitting idly by while taxing authorities put into effect a plan of taxation which deliberately permits certain classes of property to escape taxation.

271 S.W.2d at 417.

Apparently, once the tax plan has been put into effect, the taxpayer has the burden, in a case where property has been omitted from the tax rolls, of showing not only that certain property has completely escaped taxation, but also of placing a value on the omitted property, calculating the reduction in the tax rate if the property has been taxed, and determining the amount of money that he would have saved. *State v. Federal Land Bank,* 160 Tex. 282, 329 S.W.2d 847, 850 (1959). The burden is impossible to discharge, since it is doubtful that the assessor himself knows how much property has been omitted or, if he has such knowledge, the value of such property. For example, in *Campbell v. Bexar,* 567 S.W.2d 852 (Tex.Civ.App.—San Antonio 1978, no writ), this Court denied relief because the taxpayer, who was complaining of the omission of household furniture and appliances, as well as automobiles, from the tax rolls was denied relief because he had failed to prove substantial injury. This decision was reached although the Court recognized that, from a practical standpoint, the assessor, with his 180 employees, could not acquire information concerning the extent and value of the omitted property. Where a court requires a lonely taxpayer to do that which 181 taxing officials could not do is, from a practical standpoint, the same as refusing to make any effort to require that taxing officials abide by constitutional and statutory mandates. Such rules effectively prevent success by a complaining taxpayer.

In any event, the case before us is not one in which, as in *Cannon,* the taxpayer is complaining because property was omitted from the tax rolls. Nor is the complaint one of inequality resulting in discrimination because plaintiffs' property was assessed at a higher percentage of market value than other property. The complaint is a simple one. The school district and the city have attempted to tax property which is not subject to taxation, although they are doing it under the guise of taxing non-exempt property by including the value of the exempt property in computing the value of the property which is subject to taxation.[4] If the "substantial injury" rule is applicable in this case, it would mean that taxing authorities may tax all exempt property so long as the tax imposed is not substantial. If the taxing authorities are prudent, the complaining taxpayer would be lectured by the court, as was the taxpayer in *Federal Land Bank, supra,* that "since the tax on his exempt property amounted to only 41 cents, it is difficult to see substantial injury to any taxpayer under these circumstances." 329 S.W.2d at 850. Of course, 41 cents here and 41 cents there can add up to

---

**4.** The plan attempts to tax $15,485,000.00 in United States obligations owned by the First National Bank; $15,481,000.00 of such obligations owned by the Charles Schreiner Bank; and $50,000.00 owned by the National Bank of Commerce. If the assessor had obeyed the mandate of federal statute, the assessed value of the stock of the First National Bank, and the Charles Schreiner Bank would have been a negative figure, while in the case of the National Bank of Commerce such assessed value would have been $1,220,856.00 instead of $1,270,856.00.

hundreds of thousands, if not millions, of dollars illegally extracted from the taxpayers, all, of course, without imposing substantial hardship on any one taxpayer. The taxing agencies profit handsomely from their illegal activities while the courts content themselves with adjusting the judicial blindfold to insure that the old adage, "you can't fight city hall," remains true, at least in the area of taxation. Our courts have not held that proof of substantial injury is required in every case.

Where the taxing scheme is "wholly unlawful and fundamentally wrong" because it places a tax on exempt property, there is no justification for judicial tolerance and eye-winking disguised as procedural rules. Even in cases where the complaint is discrimination resulting from omission of property or the assessment of plaintiff's property at a higher percentage of market value than that at which other property was assessed, the reluctance of the courts to interfere cannot be justified. The decisions placing impossible burdens on the taxpayer are patently result-oriented. The reluctance to demolish the financial structures of governmental agencies may be understandable, but this does not justify the judicial inertia which the decisions reflect. Our courts can take steps to insure compliance by making their decisions prospective. This can be easily achieved by holding that while the particular illegal and fundamentally wrong tax scheme before the court will be allowed to continue in operation for the particular tax year involved, similar tax schemes adopted in the future will be struck down.

■ Where the taxing plan is "wholly unlawful and fundamentally wrong" because it results in the taxing of exempt property, there is no justification for judicial blindness and tolerance disguised as rules relating to burden of proof. Absent justification for rules shielding taxing agencies which impose illegal taxes, the substantial injury requirement should not be extended to cases of taxation of exempt property.

As already pointed out, the *Cannon* requirement of proof of substantial injury was explained as punishment of the taxpayer who sits idly by and allows an illegal plan to go into effect. In this case, the taxpayers did not sit "idly by." The trial court found that the plaintiffs did not sit idly by but acted diligently and that the suit was timely filed. This finding is supported by the evidence.

The Board of Equalization convened on July 14, and adjourned two days later, July 16. The members commented that they were sympathetic to the situation, would consider the presentation made by plaintiffs and would let plaintiffs know of their decision. The Board adjourned that same day without notifying plaintiffs of their decision. On July 18 the assessor notified plaintiffs that while the Board understood the need for relief, the Board had left the values submitted by the assessor unchanged. This suit was filed on July 29, 13 days after the Board adjourned and 11 days after plaintiffs were notified that their protest had been rejected.

■ We cannot hold that plaintiffs were not justified in relying on the Board's promise that they would be notified when a decision was reached and in withholding the filing of suit until they were notified of a decision. Taxing authorities should not be allowed to escape an injunction or mandamus attack on their taxing schemes by lulling the taxpayers into a false sense of security. *Cf. Childs v. Reunion Bank*, 587 S.W.2d 466 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.).

There are decisions, such as *Dorman v. Ferris Independent School District*, 581 S.W.2d 783 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.) which hold that a suit seeking injunctive relief is not timely filed if it is filed after the Board has certified the tax rolls. As defendants point out, these cases do not speak of diligence on the part of the taxpayer. They simply hold that suit filed after the rolls have been certified is a suit filed after the tax plan has been put into operation and the substantial injury rule is applicable. Defendants argue that, in view

of such decisions, whether the taxpayer acted diligently is irrelevant, despite the holding in *Childs*. In the alternative, they urge that *Childs* must be limited to its peculiar facts and applied only where the taxing authorities have led the taxpayer to believe that the tax plan would not be implemented until notification of the Board's decision had been given. We do not agree.

It is difficult to justify the requirement that a taxpayer file suit before the rolls are certified or else be saddled with the burden of proving substantial injury. It might be possible to justify the imposition of such burden upon the taxing agency when the rolls have been certified, the tax rate has been set, tax statements have been mailed and collection of taxes has begun. In such a case it can be argued that the taxing agency has begun to rely on the revenues being generated. But where, as here, the tax rate has not been set and the suit if filed before the taxes are even due, the reliance argument is unpersuasive.

■ There are practical problems involved which may make it virtually impossible for the taxpayer to sue before the rolls are approved. For example, in the case before us, plaintiffs were able to obtain a hearing before the Board only hours before the Board approved the rolls and adjourned without notifying plaintiffs of any decision concerning their complaint. In order to comply with judicial notions concerning the time to sue without being penalized by imposition of the *Cannon*, sanctions, they would have had to rush to the court house before they learned of the Board's decision. It is a strange rule which requires a taxpayer to initiate a judicial challenge to the action of a quasi-administrative decision before the administrative agency has made a decision. In order to file suit before the rolls were certified in this case, plaintiffs would have to presume that the Board would act illegally and disregard the federal statute, in the face of the presumption *that* governmental authorities will discharge their duties according to law. Until plaintiffs learned of the Board's decision,

plaintiffs were in no position to solemnly allege, in a petition for injunction or mandamus, that the taxing authorities had violated the law or were threatening to violate the law. Nothing occurred during the hearing before the Board which would furnish a basis for the conclusion that the Board intended to violate the law. In fact, the evidence supports the conclusion that each Board member indicated a sympathetic attitude concerning plaintiffs' complaints. Until the Board certified the roll, plaintiffs had no basis for believing that the Board had acted illegally. The date of initiation of legal proceedings has little relation to the possibility of interference with the collection process. It is highly doubtful if, in this case, for example, a suit filed on July 16 instead of July 29, would have been finally determined before the tax rate was set, statements mailed and revenues collected. M.G. Yudof, *The Property Tax in Texas under State and Federal Law*, 51 TEX.L.REV. 885, 905–6 (1973). There is, therefore, no logical or practical reason for making a distinction in favor of plaintiffs who sue before certification of the rolls. In the case before us, what would have been gained if the suit had been filed minutes before the rolls were certified? What disadvantage was created by the fact that the suit was filed 13 days later? The rule which requires a taxpayer to challenge an assessment before he knows what the official assessment is makes no sense.

■ It should be sufficient if the suit is filed before the governing body sets the tax rate, since it is only in the determination of the tax rate that the governing body truly relies on the assessment rolls. *Atlantic Richfield Co. v. Warren Independent School District*, 453 S.W.2d 190, 195 (Tex.Civ.App.—Beaumont 1970, writ ref'd n.r.e.) supports the conclusion that a suit filed before collection had begun is filed before the tax plan has been put into effect.

■ The cases relied on by defendants assume that a tax plan has been put into operation when the assessment rolls are approved. This theory is unacceptable un-

less we accept as a "tax plan" a situation in which the "plan" consists solely of the approval of the assessment rolls. Such a "plan" is clearly incomplete until decisions have been made concerning the tax rate. Certification of the assessment rolls is but one step in the procedure which leads to the imposition of a tax, and it cannot be seriously argued that a "tax plan" has been put into operation before the tax rate has been established and the taxpayer knows what his tax liability will be under the "plan."

 A tax plan, if it deserves to be called a "plan," contemplates the raising of a given amount of revenue which is required to support a budget. A Board of Equalization is not concerned with the amount of money to be raised. Its sole concern is to insure that the assessments are proper and truly reflect "market value." It would clearly be improper, if not blatantly illegal, for the Board to base its assessments on the needs of the governmental agency involved, since the monetary needs of the governmental agency are irrelevant in the process of determining proper assessments. The amount of money required to finance the operations of a school district or a city is a question to be determined by the governing board of such district or municipality, and not by a body whose sole concern is with value of property. Determinations concerning the value or property subject to taxation cannot be considered a "tax plan," since such determinations, have nothing to do with determining the method by which the required revenue is to be raised.

A tax "plan" which requires the taxation of exempt property is blantantly illegal. It is not only "fundamentally" wrong, it is indefensibly wrong. There is no reason for courts to protect such illegal action by penalizing the taxpayer and rewarding the wrongdoer by resort to judicially-invented doctrines designed to insure that government collects taxes illegally imposed.

We conclude that the trial court should have invalidated the illegal assessments.

The judgment of the trial court is reversed, and the cause is remanded to the trial court for entry of a judgment in accordance with this opinion. Nothing herein shall be interpreted as being a denial of the right of taxing agencies to reassess the shares of stock in accordance with applicable law.

The judgment of the trial court is reversed and the cause is remanded with instructions.